The final matter, number 22-1806, Jennifer D. Aldea-Tirado v. PricewaterhouseCoopers, LLP. At this time, would counsel for the appellant please introduce herself on the record to begin. Good morning, your honors. May it please the court. My name is Monica Alejandro and I request to be at the bottom. In this case, we request that this court reduce the number of granting of the motion to compel and order arbitration. The district court failed to apply the summary judgment standards and principles to the motion to compel. And in so doing, it failed to draw all reasonable inferences in favor of Aldea-Tirado and failed to consider the totality of the evidence. And we hope that there was a genuine visual fact as to the mental question of whether Pricewaterhouse had met its verdict of showing that at Aldea-Tirado, we see minimally sufficient notice that they could infer consent in order to apply and make enforceable the arbitration. In other words, the district court assumed, because of what Pricewaterhouse produced, that Pricewaterhouse had met its verdict in proving that there was an enforceable agreement. Can I ask you to get at this? Sure. Suppose we thought the evidence sufficed to establish beyond dispute that the ordinary letter, the U.S. mail letter, arrived at her residence. Would that alone be enough under view, or are you saying even if that's what the record shows, you're still saying there's a triumphal issue of fact as to whether there was no evidence? Yes. The line of cases, both from the Supreme Court and this circuit, none of them has determined that just the mailing of a letter, the dropped letter… But I'm going a step further. Not dropping it in the box, but also if it also is established that it arrived. Is that enough? Or are you saying even if it arrived, that's not enough? Even if it arrived, the problem in this case is that there is no acknowledgement of receipt by the employer, neither by the email or the letter. And what authority do we have to look at with respect to the, not the email, but the mail letter? I have not found any case law. And for this purpose, are we applying basically federal common law or Title VII law, federal law, to determine how much notice had to be provided, or are we applying Puerto Rico law? It's a mixture. Being a mixed jurisdiction between civil law and common law. But in the application of… No, no. I don't say civil versus common law. I mean… Oh, sorry. I misunderstood. Since the underlying claim is a Title VII claim. Yes. Is it federal statutory law about what is appropriate under Title VII that we're construing in trying to figure out how much notice your client had to get? Or is it Puerto Rico's law of notice as a general matter, or I don't know what, that we're applying? Well, I would say that it's a mixture between the Federal Arbitration Act and the Puerto Rico law about contracts. About how contracts are formed. So the Title VII language is irrelevant to that inquiry, Campbell, and all of that? In this, because we're not getting into whether the dispute is encompassed in the arbitration agreement or not. We're just talking about contract formation. The very genesis of the arbitration agreement to make it enforceable or not enforceable. Whether there was consent or no consent. But I guess what I'm having a little trouble figuring out is why, if the requirement for consent under Title VII to arbitrate is higher than consent to arbitrate other things might be, why wouldn't that question of notice for a Title VII arbitration itself be part of the contract formation clause? It should be, I would say. So does that mean we really have to be interpreting Title VII and Campbell? I think that Campbell provides the answer to analogous to this case. And the same thing happens with the Supreme Court cases where, when you're talking about specificity and transparency of the arbitration agreement, even the Supreme Court, cases in which the arbitration agreement were enforceable in some parts when they spoke about class action and class enforcement, the Supreme Court routinely and repeatedly refused to read into the language the silent, interpret the silence because it was not included in the original. But here we're at a step, as you acknowledge, we're not at the step of construing the content of the notice. Exactly. We're trying to figure out what constitutes notice. And I guess what I'm trying to figure out, since you're right that there may be a prudent in the case law as to whether you have to have proof of receipt by registered mail or whether it's enough to just send it. No. That is a function for the question of whether you form an agreement to arbitrate a Title VII claim, whether that's really Title VII law dictates the answer to how much notice you have to give, and then to whether there's information in the contract to arbitrate a Title VII claim. That makes sense. Versus general arbitration? Yes. Okay. I understand your point now, and I'm sorry for it. I understand that under Title VII, the requirement is heightened. It is not enough for an employer. What supports that? I'm sorry? What supports that? The casual quote that there is an interest? Yeah, but is Campbell about the receipt of notice itself as opposed to the content of the notice? I think that at the point that we're at right now is even to the very minimum subject of notifying the existence of the contract. And what supports that point? Campbell? Does Campbell deal with that exact issue? Well, no. Right. So that's what I'm saying. So since it doesn't, is there anything that addresses that exact issue? Well, there can be no consent, Your Honor, in any contract if you're not notified. I'm asking not the question of whether you think it. I'm asking if there's any authority that addresses that point. Not necessarily, directly. So there could be a fallback for a legal contract. Exactly. And that's the fallback position that we argue, that there is no contract where there is no consent, and there is no consent if you have not been informed and have not been notified about the document that you're supposed to be authentic to. And here, more so with respect to the subway judgment standard. Your Honor, so does Puerto Rico law say anything more specifically in its contract formation jurisprudence about what happens when something like this is mailed? The issue, I have not seen any document or any case where it says just the mailing when it's under the Federal Arbitration Act. Because you could say that under Puerto Rico law, silence may be construed as acceptance in certain circumstances. And under certain circumstances, the presumption that a letter arrived at a particular address is also sustained. What gives rise under Puerto Rico contract formation law that that presumption is a valid presumption? What are the circumstances that the Puerto Rico Supreme Court has said that the mailing is a valid presumption? In the code of civil law, there is a particular statute in the civil code stating the presumption that when a letter is sent to a particular address, it's assumed or presumed that it has been received. It's a general presumption. But in the cases that we cited, and even the defendants that have been cited with respect to the application to the Arbitration Act, there is not one that accepts that presumption as sufficient to impute knowledge, to impute consent, to impute understanding, to impute assent and waiver of the access to the judicial courts. Is the only claim here that is subject to arbitration a Title VII claim? Yes. So I guess one thing that I'm trying to get my head around is resolving the question of what level of notice has to be given for any claim under the Federal Arbitration Act is a very broad one. Yes. Deciding what it has to be for a Title VII claim alone is a much narrower one. Yes. And there is some reason to think that Title VII may have its own obligations to be particularly clear before you treat somebody as waiving their Title VII claim. That's right. So if we took that view, what I'm having trouble with is none of that seemed to be in the district court's analysis. Was that raised to the district court that even if the letter arrived, it still wouldn't be enough because Title VII itself requires more than that in order to have an agreement to arbitrate a Title VII claim? Your Honor, before the district court, the analysis was simpler because this case did not… Because at that point, you were really fighting about whether it arrived at all, right? Yes. Yeah, so that's partly my problem. I understand now you're making these other points, but typically you're sort of stuck with what was argued below. If below the fight was, did it actually get to the House? Well… And then the district court says, yeah, I don't see any basis for saying it didn't get there. How, on appeal, can you now shift to say, well, even if it got there, I still could win? Well, the thing is that there's a combination of factors because it was not only that it was mailed, but it was sent to the original… What they're saying is that they modified the arbitration agreement to an email. Well, there's both the letter and then there's the email. There's two different ones. Both they say they got there. Only one of them had to get there if the only ground that you're fighting on is that neither got there. Yes. And I have to admit that when we made the argument about the mailing, we had not recognized that the mailing address that the BWC asserts it mailed the address, the letter to, was different from the address that PWC used to send letters to Ms. Alvear. And it comes out… I have a quick question. Sure. I think that's part of the answer. So we know we have the affidavit denying receipt of the letter. Exactly. Is there other evidence that the mailing was not properly… Yes. The contract of employment itself, and that is at page… Contract. It's dated October 1st, March 2000, October 2013, and the date, under the date, there is the address, and it's a P.O. box. I think it's a second document in plaintiff's exhibits in opposition to motion to compel. And that is the address that PWC used to communicate with my client and send documents and any kind of information to a P.O. box address, not to that address. Why would that be enough to give a jury a basis for concluding that it wasn't sent? Even if you don't… Are you contending it wasn't sent? Because there is an issue. That's the whole thing. It's for the jury to determine credibility. But they have to have some non-speculative reason to disbelieve the other party. Because my client says he never received it. That's not a contention that it wasn't sent. But although there's… Is that the idea? Because she says she didn't receive it, you could disbelieve the person who said he sent it. But the issue is, Your Honor, if I may, that the verdict of proving that they complied with notifying and letting the person, the employee, know is upon the defendant. It's upon the employer. And the e-mail do not have, for example, the e-mails do not have any acknowledgment of receipt. Does that mean that it's assumed that it was received? No. The e-mails that they sent, the e-mail that the company sent, does not have an acknowledgment of receipt, does not have any push buttons. Something completely different from the protocol that they used when notifying employment decisions regarding the terms and conditions of the employment contract. It's a completely diversion from the standard procedure used by PWC. So it's not just one issue. It's just the totality of the circumstances. Just one clarification. I understand that you're saying that the e-mail was sent to a nonstandard, incorrect e-mail address. Are you also saying that the U.S. mail delivery was sent to the wrong address? Yes. Yes. The contract letter between PWC and my client clearly sets forth the P.O. Box address where PWC knew that my client would receive communications where PWC usually. Is it her P.O. Box? Her P.O. Box. Okay. Her P.O. Box. And it was sent to something other than her P.O. Box? It was sent to another address. Okay. And that was talked about below? No. That's why I admitted from the beginning. I conceded that that particular point, the specificity that comes out from the documents, comes out from both the documents from PWC where it identified the address where it sent the letter and the contract letter that specifies the P.O. Box where PWC sent— But below, the argument was it never got to—not the P.O. Box. It never got to the address that they sent. Exactly. That's the only argument that was made below. It's true. Yes. I'm just stating, and I conceded, that I just realized that I looked at the contract and realized that there was a P.O. Box. So I conceded that I didn't bring that up before. It's just another point. Thank you. Thank you. Thank you, Counsel. Now, if Counsel for the Appellee would please introduce himself on the record to begin. Thank you, and may it please the Court, Jacob Spencer of Gibson Dunn, on behalf of PricewaterhouseCoopers. The question whether Aldea consented to the arbitration agreement is one of contract formation, and that is governed by Puerto Rico law. And under Puerto Rico law, the district court got this exactly right. Is that true even when we're talking about the contract being arbitration of a Title VII claim? Yes, Your Honor. A couple of points on that. First, there are additional claims under Puerto Rico law that are asserted in the complaint that are subject to arbitration. Okay, but as to the Title VII claim— Also, the case I would look at there, Your Honor, is the Rivera-Colomb against AT&T Mobility case, which is 913 at 3rd at 200. And at the end of the opinion, the court addresses this confusion that had plagued the district court in that case between the Campbell standard of appropriate notice under Title VII for the arbitrability of a Title VII suit and the question in that case, which is the question here, whether a valid arbitration agreement existed in the first place. And the court said we're not applying the Campbell standard. Instead, we are talking about contract formation and notice within the context of contract formation. And that question is governed by Puerto Rico law, not any heightened standard that might be offered. If that's our case law, maybe I wasn't even on the panel, but does that make much sense to you? Well, you were not on the panel. But does that make sense to you? I mean, because why—the question is, was a contract formed about arbitrating a Title VII claim? Why wouldn't—if there's a special rule that Title VII has for when you can arbitrate, why would we think we could know whether there was one without looking to what Title VII demands for you to know you entered into such an agreement? Well, I think with respect, the Campbell-wide cases about interpreting appropriate to require a heightened notice requirement is the subject of a pretty acknowledged circuit split, which Campbell himself acknowledged. So I'm not sure that that—I think that may have been a misstep in this court's jurisprudence. But I think you could separate the two because one is a question of contract formation, which the Supreme Court has said is typically one on the more liberal side. The other is about the scope of arbitration. I understand that. I'm just saying, though, how do we know Title VII doesn't have its own view about what you have to know before you've entered into a contract to arbitrate a Title VII claim? We do that for waiver of Title VII for 1983 claims. There's a whole jurisprudence about when you can waive one of those, right? I think both the Supreme Court and this court have been clear that there is a distinction between a contract formation question and a scope of arbitrability question. There absolutely is. I'm just saying maybe Title VII is interested in both. There's no reason in principle it wouldn't be. Well, I think that, again, this court's reading of a heightened standard for notice, into the word appropriate, has been disputed in the court's appeals. I think it would be a bridge too far to say that that also is a question that goes to contract formation. Since Eric Vaughn and other cases from this court have made clear that contract formation is governed by a state or, in this case, California law. What do you understand Puerto Rico law to be on that? So I think Puerto Rico law, the case of Jante Valentin, is responsive. So it's on all fours in this case. There, the employees were notified by email about the arbitration agreement. That email made clear that if they continued working at Pfizer past a certain date, they would consent to arbitration. They continued to work past that date. But in that case, there was no contest. It wasn't about the fact that the email was sent and received, was it? There was no contest that it was mailed, but there absolutely was a contest about receipt. And, in fact, the Intermediate Court of Appeals there said, quote, that many of the petitioners, not all, but many, quote, submitted sworn statements containing specific facts of which they had personal knowledge, including that they did not receive email from contractors. That's in the appendix at page 19. So on that basis, the Intermediate Court of Appeals said this is a material fact dispute. We need to remand it for never that you're hearing about whether they got the email. And the Supreme Court of Puerto Rico said, quote, there are no material facts in controversy. That's at Act 110. And then at Act 113, the employees' sworn statements were insufficient to raise a genuine fact dispute. So this question is governed by Puerto Rico law under a Conte Valentin. It's on all fours in this case. There's no dispute that she received – Well, this case is totally different. If they're saying you sent it to the wrong email address. Well, I think that's right. So then you have to look at whether there's anything in the record that refutes the FOX declaration, which PwC put in on reply. Plaintiff filed us a reply that was considered by the court, and there is no evidence refuting what FOX said, which is essentially we're working in a Lotus Nose program. There's one address, which is aldea.toronto.com. And that's the address for when you route something within the Lotus Nose environment. And then you have another address, which is jennifer.aldea.toronto.com. Don't quote me on that one. That's what Lotus Nose used when you're routing something to and from the internet. Can you explain what it means to have emails routed within the Lotus Nose environment, and how would employees receive or view emails routed from that? Would they have to log into it, for instance? Is there an extra step associated? So it's all one email account. So as FOX said, it's a valid, unique descriptor of the same email account. So from an employee's perspective, it would all look the same. But in this case, PwC set up a Lotus Nose database, too, because it's all working within the same Lotus Nose system on different servers. They can set up a Lotus Nose database, and so they're using this internal routing mechanism to get it to the current email address. Just practically speaking, I don't read every email I get, even from the administrative office of the court, which is bad on me, but I don't think I'm unique in not reading them all. So your position seems to be that for something this consequential, it's enough to just send an email from the employer. And if I didn't look at it that day, tough on me. I've agreed to waive my Title VII claims and everything else and have them all be arbitrated. Correct? So that is the rule under Puerto Rico law and under Amante Valentin, because there is sworn testimony I didn't receive it. There's also sworn testimony I don't recall seeing it, and I didn't attend the meeting about arbitration. I guess what I'm trying to tease out is Puerto Rico law can't really itself answer what are the demands for Lotus under the Federal Arbitration Act. And I understand the point about contract formation, but the fact that Puerto Rico law, and I had understood the way the Federal Arbitration Act law works, is it's kind of a, as your opponent was saying, a bit of a hybrid. It's federal common law, which borrows from the state law. It doesn't just pick up state law no matter what state law says.  It's impermissible because it's inconsistent with the act. But if you took it further, and I'm not saying Puerto Rico doesn't, but if Puerto Rico had the rule, it doesn't matter if it got there, as long as you sent it, you were notified. Presumably we wouldn't say, well, then Puerto Rico treats it as contract formation. Tough luck for you, right? We'd say, oh, the Federal Arbitration Act has its own interests. That's not enough to permit you to arbitration, or is that wrong? Well, I'm not sure that is right, Your Honor. I think it would depend on how Puerto Rico treats contracts generally. It wouldn't have a special rule for arbitration. So if this is enough to form a contract in any other circumstance, it would be enough to form an arbitration agreement. But I want to say, and I continue to think Campbell is the wrong framework for addressing this issue. It is a state law question, and it's controlled by a party to that one. But if you were to look at Campbell, there are, I think in our brief, we said four things to distinguish Campbell. I actually today have eight. The Senator in Campbell was – Don't come back tomorrow. The Senator in Campbell was a broadcaster. The Senator here was the Office of the General Counsel. The subject line in Campbell said, G. de Mereau, New Dispute Resolution Policy. Here it said, Important Legal Document Affecting Your Rights. Please read. That one didn't say you wait until you write a judicial forum. This one did before. That one didn't say mandatory arbitration. This one did. That one didn't say you're bound by this if you don't reject it. Did the email say important in the header, important legal document? Yes, that was the subject line of the email. And again, with all of that – all of these ways in which the arbitration agreement was buried in Campbell – I know, by the way, it wasn't even in the email. It was on the intranet page. Here it was attached to email. With all of that, Campbell said it was a closed case. So, I mean, this one is not a closed case. Any reasonable military employee would look at this email. And under Epon de Valentin, that's more than enough under Puerto Rico law. And that's all just email. You also have the letter sent by U.S. mail. Is there some reason why the employer wouldn't require a confirming receipt? I don't know at the time, but I know that in – again, turning to my favorite case, Epon de Valentin, right? There are 25 petitioners in that. Although that email did request an acknowledgement of receipt, only three of the plaintiffs actually acknowledged receipt. But the court nonetheless held the rest of them accountable. But the supposedly debunked despondent case was a case in which the email requested receipt. But the important part is that 22 of the 25 did not click the button to acknowledge receipt, and they still were subject and bound to the arbitration agreement under Puerto Rico law. I'm just a little confused about the emails. So there are two email addresses. There's the Lotus Notes, and there's the one you recited. The notice was sent to both? The notice goes to one email account. Okay, either address, but it's all merged together in the same system. One account. And I know that I'm out of time. I just wanted to respond to a couple of the record issues. Can I just ask one more question? Sorry. There's no evidence of – Usually when I send an email, I have a sent email. I can print out and say I sent this to you. That's not – we don't have that on the records, right? Well, the email to Aldea is in the records. I want to say it's an app. App 731. Go ahead. Before you get to your last point, this is a follow-up to your response to Paula's question. So they're saying that – you're saying that it's one email address, and it was sent from Lotus, and it was sent from this Internet base or whatever. It still gets to the same request. They're saying – well, they're denying it. But they're also saying that that's a rigid protocol as to how you traditionally send these kinds of emails. And I gather your response is it doesn't matter because they're all posted the same inbox. So the FOX declaration addresses this and says there are two different addresses depending on where the email is originating and how it's routed, but they all get to the same place. And so that's unrefuted testimony that it's all going to the same email. So it's an argument about which protocols are very important. That's right. That's right. And just a couple more record points on the mailing address. Isn't there – I thought there was evidence in the record of a separate email having been sent to her that would not get to Lotus numbers. It would get to a different account number. Well, so she has an email that goes to her Gmail account. And I thought there was evidence that sometimes they – that at least once the employer has emailed that account. Is that wrong? There is, I think, in the context of the back-and-forth broker arbitration, but it may also be related to the contract offer in October 2013 before she joined the NFC based on her email. Why is that not potentially significant for creating a jury issue? Well, so I think for two reasons. First, under Puerto Rico law, the evidence is unrefuted that they sent it to her Lotus numbers. The question of whether that's sort of part of the normal course of procedures is really a Campbell question, so not the standard that should be applied. And in Campbell – But that issue in Puerto Rico law is even dealt with. So – In other words, it wasn't contested that it was part of the normal course in the contract making. Not to my knowledge, that was – Well, how do we know Puerto Rico wouldn't require a basis for the jury when it wasn't part of the normal course? Well, we say that not just the Puente Valentin, but a lot of cases in a lot of courts – From Puerto Rico? Not from Puerto Rico, but from – But if Puerto Rico is the despondent thing, how do we know that Puerto Rico wouldn't find it concerning that it wasn't part of the regular course? Well, I think typically when – if you do come across an issue of Puerto Rico law, the Puerto Rico court has not spoken specifically to it. You look at the broad run of cases across the country and see how they've dealt with it. I mean, you put in a bunch of cases from a bunch of different courts, all of which said this is an acceptable way to form an arbitration agreement, and the site didn't come back with any cases telling that way. So I think that it's more than enough basis to say that Puerto Rico can solve it. Can I ask you whether – was the Puente a Title VII case? The Puente was not a Title VII case, no. But you're saying under Roberto Colón. I mean, I guess what I'm trying to think through is how do we know Puerto Rico wouldn't apply a special rule for Title VII cases? Well, the basis of Campbell is a statutory interpretation of the word appropriate. So on that narrow question, Puerto Rico may have a different rule, which would then have to be resolved by the Supreme Court, starting a service place so that they could just join the rally. But the Puerto Rico Supreme Court's interpretation of the word appropriate wouldn't be binding on this point. The Puerto Rico Supreme Court's interpretation of the word appropriate wouldn't be binding on this point. No, but I guess what I'm saying is what you're asking us to do is assume Puerto Rico wouldn't have a view about appropriate as the basis for their standard for contract formation for arbitration on a Title VII claim. How do we know that? Well, I'm not aware of any reason why you would think that that question would go to contract formation. Well, the only reason is the reason that's leading me to ask you whether it does. Well, so Campbell – I mean, Rivera-Colón specifies that Campbell is not a contract formation case. Campbell is about the arbitrability of a federal statutory claim based on an interpretation. There's just no good reason to think Puerto Rico would do that. There's no basis that I see to do it, and certainly they couldn't do it by extending this court's Campbell decision  But again, even if you accept – and this is Campbell – even if you accept Puerto Rico would apply the same appropriate test, the email in that case was still a close question, and I didn't get to all of them, but there's seven different ways to distinguish that email, and in this case, DWC said what. But it matters a lot for how we decide the case, though, whether you think that what we're doing is, in a case like this, bound by what Puerto Rico law does in a non-Title VII case about contract formation, or whether we instead say, no, the right way to decide this case is assume, at least for the Title VII claim, it is a Title VII contract formation question, and then you either win or lose. Under that, there's a very different rule. So I think how I would resolve the case, respectively, is I would start with this is a – Rivera-Colón, this is a contract formation dispute that's governed by Puerto Rico law, and Aponte Valentin is dispositive on that question. And Rivera-Colón was a Title VII issue? Rivera-Colón is not, and that's why I criticized the district court for applying – I think this is, as to the Title VII part. So we don't have a holding about what to do in a Title VII claim under Campbell for contract formation. Is that right? So Rivera-Colón citing Campbell calls these interrelated but independent questions. Yes, but I'm just saying with respect to Title VII arbitration questions, we don't have precedent telling us how to treat the contract formation question as to whether Title VII's appropriate language can apply to the formation issue. So contract formation under the Federal Arbitration Act is a state law issue, so I don't see why it would be governed by the statute. Because Title VII is a special statute that has its own rules? Right, so that question is about the arbitrability of Title VII claims, which is a question of scope. Last question. Is this debate that you and I are having right now, this issue, was this issue raised below? So I don't believe that it was raised specifically below. The district court expresses a little bit of confusion about the ground for the objection to arbitration, and for the most part treats it as a question about whether the email and whatever got there. But the court also mentions Campbell and distinguishes Campbell and then mentions unconscionability. If I could just address the mailing address issue very quickly. The document that my friend on the other side cited is Act 138, where there's a PO box. If you look at Act 138, that is sent by PwC's campus recruiting coordinator, which might suggest why it's a different address. But then in Act 147, paragraph 4, which is the response to PwC's statement of undisputed facts, Aldea admits that the address that was where the arbitration agreement was sent reflects your home address in 2014. So the record refutes any suggestion that this was the wrong address, and under all the cases we cited, the mere denial of receipt of a letter or an email is not sufficient. Thank you. Thank you, counsel. Counsel, for the appellant, we're pleased to reintroduce herself on the record. There's a two-minute rebuttal. May it please the court. My name is Margarita Evelin. First, we take issue with characterizing Aldea's assertion that the protocol at PwC regarding notifying changes in the terms and conditions of employment is a red herring. She's an attorney licensed to practice law. So she understands what is making a statement under penalty of perjury. And she affirmed under penalty of perjury that PwC's protocol, when they're notifying their employees about changes in the terms and conditions of employment, they do it through the emails that are identified in the record, and that the protocol instituted by PwC to ensure that, in fact, the employees have a knowing and informed concept of any changes, can ask questions, look for legal assistance, is to acknowledge receipt. The same about Aldea's statement that the letter was not received by her. She's not saying that's not a home address. Actually, that was where she lived with her mother years ago. She's not saying that. She's saying, as I'm saying right now, that the address that PwC used to inform her about important decisions regarding terms and conditions of employment, starting with the employment contract, was the address. What I'm saying is that it didn't get computed that whether the email was sent to one of her addresses or one of her other addresses, they all were funneled to one email box. If she would have received it the way the system is set up, she would have received it either way. No, but my client does not see it that way. According to my client, the Lotus program and that email was used by PwC to notify issues of accounting, issues of other issues that had nothing to do with the terms and conditions of employment, and not necessarily even about her exact position herself, general information, but not about terms and conditions of employment or changes in policy or any of that kind of structure. So she did certify that she did not receive it either in one address or the other, ever. And had she done it, she would have had the opportunity as an attorney to review the contract. She understands arbitration agreements.  She would have analyzed if it was okay for her, if it was acceptable, and she would have decided knowingly and duly informed whether to stay at PwC or to move on to another employment. But she did not. Thank you. Thank you, Your Honor. Thank you. That concludes argument in this case.